# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| MORRIS JAMES LLP, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Civ. No. 11-19-SLR |
| | ) |
| CONTINENTAL CASUALTY | ) |
| COMPANY, | ) |
| | ) |
| Defendant. | ) |

_____

Edward M. McNally, Esquire, Mary B. Matterer, Esquire, and Corinne Elise Amato, Esquire of Morris James LLP, Wilmington, Delaware. Counsel for Plaintiff.

Paul Cottrell, Esquire, and Melissa L. Rhoads, Esquire of Tighe & Cottrell, Wilmington, Delaware. Counsel for Defendant. Of Counsel: Edward M. Napierkowski, Esquire of Colliau Elenius Murphy Carluccio Keener & Morrow.

_____

## MEMORANDUM OPINION

Dated: March 12, 2013
Wilmington, Delaware

**ROBINSON, District Judge**

## I. INTRODUCTION

This case features a law firm as the unfortunate victim of a scam in which it lost $176,750. The law firm, Morris James LLP ("plaintiff"), now seeks to recover the money under the provisions of an insurance policy ("the Policy") issued to it by Continental Casualty Company ("defendant"). Plaintiff originally filed its complaint against defendant on November 30, 2010 in the Superior Court of the State of Delaware in and for Kent County. (D.I. 21, ex. A) On January 6, 2011, defendant filed a notice of removal pursuant to 28 U.S.C. §§ 1441 and 1446, bringing the case before this court. (D.I. 1) Defendant filed its answer on January 11, 2011. (D.I. 5) On April 11, 2012, following an initial status conference, the court stayed discovery and set a briefing schedule for summary judgment. (D.I. 17) Currently before the court are the parties' cross-motions for summary judgment. (D.I. 20, 22) The court has jurisdiction over this matter pursuant to 28 U.S.C. § 1332(a)(1).

## II. BACKGROUND

### A. The Parties

Plaintiff is a limited partnership organized in Delaware with a principal place of business in Delaware. (D.I. 1 at ¶ 6) Defendant is a corporation organized in Illinois, with a principal place of business in Illinois. (*Id.* at ¶ 5) The amount in controversy is $176,750, which the plaintiff lost in the scam. (*Id.* at ¶ 3)

### B. The Scam

In June 2010, plaintiff was approached by a foreign company calling itself Esa Corporation Group Oyj ("Esa") for assistance with collecting a debt allegedly owed by a

Delaware entity, B&B Industries ("B&B"), under a sales agreement. (D.I. 21, ex. A at ¶ 4; D.I. 24, ex. 2 at CCC149) Plaintiff believed both entities to be involved in the steel industry. (D.I. 24, ex. 2 at CCC149) Esa signed an engagement letter with plaintiff and also provided plaintiff with a copy of the purported sales agreement regarding the products sold and the outstanding debt. (D.I. 21, ex. A at ¶ 5; D.I. 24, ex. 2 at CCC149)

On July 7, 2010, Esa informed plaintiff that B&B had agreed to a settlement of the debt in order to avoid litigation. (D.I. 21, ex. A at ¶ 6; D.I. 24, ex. 2 at CCC149) On July 13, 2010, Esa notified plaintiff that B&B had made a partial payment toward the settlement. (D.I. 24, ex. 2 at CCC149) Plaintiff then received what appeared to be a cashier's check drawn on Citibank in the amount of $195,495 ("the purported check"). (D.I. 21, ex. A at ¶ 6) The purported check included all of the identifying marks of a valid Citibank cashier's check, including an "Official Check" notation and branch and teller numbers. (D.I. 24, ex. 2 at CCC149 & ex. 3) On July 20, 2010, plaintiff deposited the purported check to its account. (D.I. 21, ex. A at ¶ 7) Of the $195,495, Esa instructed plaintiff to keep certain funds as compensation for legal services and to transfer $176,750 to an account in Japan to pay a Japanese company for products sold to Esa. (*Id.*, ex. A at ¶ 6; D.I. 24, ex. 2 at CCC149) On July 20, 2010, finding no issues with the purported check, plaintiff followed Esa's instructions and authorized a wire transfer of $176,750 to the Japanese account. (D.I. 21, ex. A at ¶ 8) The money was released to the holder of the Japanese account on July 21, 2010. (*Id.*, ex. C) On July 22, 2010, the purported check was returned by Citibank to plaintiff's bank as "altered/fictitious" and "counterfeit." (D.I. 24, ex. 4; D.I. 27, ex. K) Plaintiff received the voided purported check by mail on July 26, 2010. (D.I. 24, ex. 2 at CCC149) Although

2

plaintiff has attempted to recover its lost funds through various means, those attempts have thus far proven fruitless. (D.I. 21, ex. A at ¶ 11; D.I. 24, ex. 2 at CCC149-50)

### C. Plaintiff's Insurance Claim

The Policy was in effect at the time of plaintiff's loss. (D.I. 24, ex. 1 at CCC5)

On August 16, 2010, plaintiff submitted a property loss notice to defendant, describing

the loss as a "fraudulent check scheme" and attaching a letter describing the facts

surrounding the loss.[1] (D.I. 21, exs. B & C) On September 29, 2010, defendant notified

plaintiff of its position that the Policy did not provide coverage for the loss. (D.I. 24, ex.

5) Plaintiff then filed this suit against defendant on November 30, 2010. (D.I. 21, ex. A)

### D. The Policy

The main portion of the Policy ("the main Policy") is titled "Businessowners

Special Property Coverage Form." (D.I. 24, ex. 1 at CCC13) Section A of the main

Policy provides the scope of coverage, which reads in relevant part:

#### A. COVERAGE
We will pay for direct physical loss of or damage to Covered Property at the premises described in the Declarations caused by or resulting from a Covered Cause of Loss.

##### 1. Covered Property
Covered Property includes . . . Business Personal Property as described under b. below . . . .

. . . .

> b. **Business Personal Property** located in or on the buildings at the described premises or in the open (or in a vehicle) within 1,000 feet of the described premises, including:
>
> . . . .
> (6) Your "money and securities"

. . . .

---

[1]The parties do not dispute the contents of the Policy or that plaintiff paid the premiums. (D.I. 23 at 5)

3

### 5. **Additional Coverages**
Additional coverages may be attached to this Policy (designation would appear in the attached form(s)). Unless otherwise stated, payments made under these Additional Coverages are in addition to the applicable Limits of Insurance.

(*Id.*, ex. 1 at CCC13-15) Pursuant to paragraph A.5, the Policy includes additional

coverages in the form of attached endorsements. (*See id.*, ex. 1 at CCC35-51) One

such endorsement is entitled "FORGERY AND ALTERATION" (the "Forgery and

Alteration Endorsement"). (*Id.*, ex. 1 at CCC43) This endorsement is listed in the

Forms and Endorsements Schedule as being part of the Policy. (*Id.*, ex. 1 at CCC1) It

provides, in relevant part:

1. We will pay for loss resulting directly from "forgery" or alteration of checks, drafts, promissory notes, or similar written promises, orders or directions to pay a sum certain in money that are made or drawn by one acting as an agent or purported to have been so made or drawn.

(*Id.*, ex. 1 at CCC43) The Forgery and Alteration Endorsement has a limit of $250,000

in addition to the applicable limits of coverage provided elsewhere by the Policy. (*Id.*,

ex. 1 at CCC6)

The Policy also states, in paragraph A.3, that the covered causes of loss are

"risks of direct physical loss" unless a loss is, inter alia, "excluded in section B.

EXCLUSIONS." Relevant to the instance case is an exclusion under section B for

losses caused by false pretenses ("the False Pretense Exclusion"), which provides:

2. We will not pay for loss or damage caused by or resulting from any of the following:

. . . .
### j. **False Pretense**
Voluntary parting with any property by you or anyone else to whom you have entrusted the property if induced to do so by any fraudulent scheme, trick, device or false pretense.

4

(*Id.*, ex. 1 at CCC18-19)

## III. STANDARD OF REVIEW

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party bears the burden of demonstrating the absence of a genuine issue of material fact. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 415 U.S. 574, 586 n.10 (1986). A party asserting that a fact cannot be – or, alternatively, is – genuinely disputed must demonstrate such, either by citing to "particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for the purposes of the motions only), admissions, interrogatory answers, or other materials," or by "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1)(A) & (B). If the moving party has carried its burden, the nonmovant must then "come forward with specific facts showing that there is a genuine issue for trial." *Matsushita*, 415 U.S. at 587 (internal quotation marks omitted). The court will "draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000).

To defeat a motion for summary judgment, the non-moving party must "do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita*, 475 U.S. at 586-87; *see also Podohnik v. U.S. Postal Serv.*, 409 F.3d 584,

594 (3d Cir. 2005) (stating party opposing summary judgment "must present more than just bare assertions, conclusory allegations or suspicions to show the existence of a genuine issue") (internal quotation marks omitted). Although the "mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment," a factual dispute is genuine where "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 411 U.S. 242, 247-48 (1986). "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Id.* at 249-50 (internal citations omitted); *see also Celotex Corp. v. Catrett*, 411 U.S. 317, 322 (1986) (stating entry of summary judgment is mandated "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial").

## IV. DISCUSSION

The material facts surrounding plaintiff's loss are undisputed, and the parties agree that Delaware law applies. (D.I. 23 at 8; D.I. 29 at 2-3) Delaware law treats the construction of an insurance contract as a question of law. *Travelers Indem. Co. v. Lake*, 594 A.2d 38, 40 (Del. 1991). "Because an insurance policy is an adhesion contract and is not generally the result of arms-length negotiation, courts have developed rules of construction which differ from those applied to most other contracts." *Hallowell v. State Farm Mut. Auto. Ins. Co.*, 443 A.2d 925, 926 (Del. 1982). The court must read the insurance contract as a whole, give effect to all provisions therein, and interpret the terms in a common sense manner. *See JFE Steel Corp. v. ICI Americas,*

6

*Inc.*, 797 F. Supp. 2d 452, 469 (D. Del. 2011); *Penn Mut. Life Ins. Co. v. Oglesby*, 695 A.2d 1146, 1149, 1151 (Del. 1997). When the language of an insurance contract is ambiguous, the court should construe the contract in favor of the insured because the "insurer or the issuer, as the case may be, is the entity in control of the process of articulating the terms." *Oglesby*, 695 A.2d at 1149-50; *see also Axis Reinsurance Co. v. HLTH Corp.*, 993 A.2d 1057, 1062 (Del. 2010); *Hallowell*, 443 A.2d at 926. "An insurance contract is ambiguous when the provisions in controversy are reasonably or fairly susceptible to two different interpretations or may have two or more different meanings." *O'Brien v. Progressive N. Ins. Co.*, 784 A.2d 281, 288 (Del. 2001). However, when the language is clear and unequivocal, the parties are bound by its plain meaning. *Hallowell*, 443 A.2d at 926 ("[I]f the language is clear and unambiguous a Delaware court will not destroy or twist the words under the guise of construing them."); *Laird v. Emp'rs Liab. Assur. Corp.*, 18 A.2d 861, 862 (Del. Super. 1941) ("[T]he courts cannot change or ignore the language of a contract merely to avoid hardships or to meet special circumstances against which the parties have not protected themselves.").

The insured carries the burden of proving that a claim is covered by its insurance policy. If the insured can show that its claim is covered, the burden then shifts to the insurer to prove that the claim is not covered by the policy. *State Farm Fire & Cas. Co. v. Hackendorn*, 605 A.3d 3, 7 (Del. Super. 1991) (citations omitted). Here, the resolution of the cross-motions for summary judgment requires the court to construe, as a matter of law, the language of the Policy's Forgery and Alteration Endorsement and

7

the False Pretense Exclusion ("the provisions"). The court finds that, while the terms of each provision are clear and unambiguous, the Policy is ambiguous when the provisions are read together.

## A. Forgery and Alteration Endorsement

The Forgery and Alteration Endorsement covers (1) losses resulting directly from (2) the forgery or alteration of (3) "checks, drafts, promissory notes, or similar written promises, orders or directions" ("covered instruments") (4) to pay a sum certain (5) that are "made or drawn by one acting as an agent or purported to have been so made or drawn." (D.I. 24, ex. 1 at CCC43) Plaintiff contends that its loss of $176,750 satisfies all of these criteria.[2] (D.I. 23 at 10-11) Defendant does not dispute that the loss was a direct result of the scam. Nor does defendant dispute that the purported check was for a sum certain and made or drawn by a scammer purporting to be an agent of Citibank. However, defendant offers two arguments for why the Forgery and Alteration Endorsement should not cover the loss. First, defendant contends that plaintiff "does not know and thus cannot represent whether the signature on the counterfeit of the check was forged." (D.I. 27 at 3) Second, defendant contends that the purported check was not a covered instrument because it was a **counterfeit** check, not a forgery or alteration of a valid check. (*Id.* at 2-3) There is no genuine dispute regarding the facts underlying these arguments – plaintiff does not know the identify of the individual who signed the purported check, and the purported check was a counterfeit. As such, defendant's arguments regarding the nature of the purported check relate to

---

[2]Plaintiff is not claiming as part of its loss any amount retained for its services or any expenses incurred before the scam was discovered. (D.I. 23 at 11 n.4)

8

interpreting the contract to determine whether the terms of the Forgery and Alteration Endorsement apply to plaintiff's loss.

The term "forgery" is defined in the Policy as "the signing of the name of **another** person or organization with intent to deceive." (D.I. 24, ex. 1 at CCC30) (emphasis added) This definition precludes coverage for an otherwise covered instrument that an individual signs in his or her own name. (*Id.*) Central to the scam in the instant case was the purported check's ability to deceive the victim and the banks involved long enough for the victim to believe that the check had cleared and, under that impression, to transfer money to the perpetrator. Because the identity of the scammer is not known, it is unclear whether the signature was a reproduction of the actual signature of an agent authorized by Citibank to make bank checks or whether it was the signature of a fictional individual. In any case, the court agrees with plaintiff that it is a virtual certainty that whoever signed the purported check did not sign his or her own name.[3] Thus, the term "forgery" in the Forgery and Alteration Endorsement encompasses the signature on the purported check.[4]

Contrary to defendant's assertion, the purported check is a covered instrument

---

[3]The scammer would have every reason to avoid signing his or her real name on the purported check. This is especially true in light of the sophisticated nature of the scam. (*See, e.g.*, D.I. 21, ex. C) (noting that "[t]he FBI indicated that this appeared to be a really ingenious scam, unlike any others in the area").

[4]There is also no ambiguity in the term "alteration." In context, an alteration is an unauthorized change or addition to a valid or incomplete instrument that purports to modify in any respect the obligation of a party. *See* U.C.C. § 3-407. However, the facts are insufficient for the court to determine whether the purported check was also an "alteration" of a covered instrument. There is no indication of whether the purported check was modified from an underlying valid or incomplete instrument.

9

under the terms of the Forgery and Alteration Endorsement. The language of the

provision covers, among other instruments, a forged check or written promise. The

general rule of negotiable instruments is that the validity of a check is dependent on the

genuineness of its signature, not the paper it is written on; therefore, a counterfeit check

– as defendant labels it – is equivalent to a forged check. *See, e.g., Dorchester Fin.*

*Sec. v. Banco BRJ, S.A.*, No. 02 Civ. 7504, 2009 WL 5033954, at \*3 (S.D.N.Y. Dec. 23,

2009) ("A counterfeit check is the equivalent of a forged check, i.e. a forgery of the

signature of the purported drawer." (citing RICHARD HAGEDORN & HENRY BAILEY, BRADY

ON BANK CHECKS: THE LAW OF BANK CHECKS ¶ 28.03 (rev. ed. 2012))); *MBTA Emps.*

*Credit Union v. Emp'rs Mut. Liab. Ins. Co. of Wisconsin*, 374 F. Supp. 1299, 1302 (D.

Mass. 1974) ("'Counterfeit' has no meaning in this context other than forged.").

Moreover, the purported check is a "written promise[] . . . to pay a sum certain"

under the plain meaning of that phrase. It was signed by the scammer and, thus,

despite being unauthorized, there was an order to pay money signed by the person

giving the instruction. *See* U.C.C. § 3-403 ("Unless otherwise provided in this Article or

Article 4, an unauthorized signature is ineffective except as the signature of the

unauthorized signer in favor of a person who in good faith pays the instrument or takes

it for value."); *see also Firstar Bank, N.A. v. Wells Fargo Bank, N.A.*, No. 02-C-186,

2004 WL 1323942, at \*6 (N.D. Ill. June 14, 2004) ("The court sees no reason to draw a

distinction on grounds that the purported drawer was fictitious. The Check itself was a

written instruction to pay money."). Therefore, plaintiff's loss was the result of a forged

instrument within the clear and unambiguous meaning of the Forgery and Alteration

Endorsement.

## B. False Pretense Exclusion

Defendant points to the False Pretense Exclusion to argue that coverage of the loss is excluded. The language of the False Pretense Exclusion is clear and unambiguous. The plain meaning requires a "[v]oluntary parting" of property, induced by "any fraudulent scheme, trick, device, or false pretense" ("fraud"). Plaintiff argues that defendant attempts to read the False Pretense Exclusion in a vacuum or, in any case, fails to establish that the exclusion applies to preclude coverage under the Forgery and Alteration Endorsement. (D.I. 26 at 8-13) However, plaintiff does not contest the meaning of the language in the False Pretense Exclusion itself. Therefore, there is no serious dispute that, in addition to resulting from a forged instrument, the scam was a fraud which induced plaintiff to voluntarily part with $176,750, within the language of the False Pretense Exclusion.

## C. The Effect of the Forgery and Alteration Endorsement on the Main Policy

Because plaintiff's loss was the result of both a forged instrument and a voluntary parting induced by fraud – two contributory causes – it falls within the plain meaning of both the Forgery and Alteration Endorsement and the False Pretense Exclusion. Thus, whether the loss is covered or excluded by the Policy hinges on which provision is interpreted to prevail, or "trump," the other when the Policy is interpreted as a whole. In attempting to give effect to both provisions, the parties submit different constructions of the contract. Plaintiff avers that the proper interpretation of the provisions together is to give effect to the False Pretense Exclusion, but not in the case

11

of forged or altered instruments. (D.I. 23 at 13-14) In other words, plaintiff views the

Forgery and Alteration Endorsement as trumping the False Pretense Exclusion to the

extent they conflict: a loss attributable to a forged or altered instrument would be

covered, even if it would otherwise be excluded by the False Pretense Exclusion.

Defendant submits the opposite, such that a loss under the Forgery and Alteration

Endorsement is covered, but not when it is also due to a voluntary parting of money

induced by fraud. (D.I. 27 at 8) Put another way, defendant views the False Pretense

Exclusion as trumping the Forgery and Alteration Endorsement to the extent they

conflict: a loss due to a forged or altered instrument would not be covered if it also falls

under the False Pretense Exclusion.[5] In sum, the provisions themselves are clear and

unambiguous, as discussed *supra*, but the parties disagree as to how they should be

read in tandem.

"An insurance contract is not ambiguous simply because the parties do not agree

on its proper construction. Rather, a contract is ambiguous only when the provisions in

controversy are reasonably or fairly susceptible to different reasonable interpretations."

*Axis Reinsurance*, 993 A.2d at 1062 (footnote omitted). For the reasons below, the

provisions are ambiguous, or susceptible to different reasonable interpretations, when

read in tandem. In light of the purposes of the provisions, the language in the rest of

the contract, and the terms of other endorsements attached to the Policy, it is possible

that reasonable persons could differ as to the effect of the Forgery and Alteration

---

[5]Defendant's motion for summary judgment only addresses the False Pretense
Exclusion and ignores the import of the Forgery and Alteration Endorsement. (D.I. 21)
Defendant offers its interpretation of the provisions together in its answering brief to
plaintiff's motion for summary judgment. (D.I. 27)

Endorsement on the main Policy.[6]

The Delaware Supreme Court has found that, where an endorsement provision

and an exclusion provision "each have a distinct and independent purpose and

function," the provisions are not ambiguous when read together. *Axis Reinsurance*, 993

A.2d at 1062. Here, however, the Forgery and Alteration Endorsement and the False

Pretense Exclusion function to define the scope of coverage and, thus, serve the same

purpose and function. Section B, delineating the Policy's exclusions, splits the

exclusions into two groups. There are twelve exclusions under the first group,

introduced by paragraph B.1:

> We will not pay for loss or damage caused directly or indirectly by any of
> the following. Such loss or damage is excluded regardless of any other
> cause or event that contributes concurrently or in any sequence to the
> loss.

(D.I. 24, ex. 1 at CCC16)  Meanwhile, the second group, consisting of seventeen

exclusions, is introduced by different language in paragraph B.2:

> We will not pay for loss or damage caused by or resulting from any of the
> following.

(*Id.*, ex. 1 at CCC18)  The False Pretense Exclusion is listed in the second group, under

paragraph B.2. On one hand, the difference in the language of paragraphs B.1 and B.2

may indicate a difference in the scope of the exclusions such that (1) the exclusions in

the first group (under paragraph B.1) are excluded regardless of any other contributory

---

[6]Contrary to plaintiff's contention, giving effect to the False Pretense Exclusion
would not render the Forgery and Alteration Endorsement to be "surplusage." (*See* D.I.
23 at 13)  The False Pretense Exclusion would still preclude coverage for the voluntary
parting of property induced by fraud, where it was not also caused by a forged or
altered instrument (or other relevant additional coverage).

13

cause or event to a loss, while (2) the exclusions in the second group (under paragraph B.2), including the False Pretense Exclusion, are subject to other contributory causes or events that might provide coverage. On the other hand, one could just as easily conclude, reasonably, that paragraph B.2 uses even broader language to exclude losses "caused by or resulting from" the listed exclusions or that losses due to the second group of exclusions are typically not found in conjunction with any other contributory causes. Thus, the language of paragraphs B.1 and B.2 does not provide clear guidance for resolving the apparent conflict between the provisions.

The other endorsements attached to the Policy also contribute to the ambiguity regarding the Forgery and Alteration Endorsement and the False Pretense Exclusion. Some endorsements attached to the Policy explicitly set forth whether they are subject to, or trumped by, certain exclusions in section B. For example, the endorsement entitled "FINE ARTS" ("the Fine Arts Endorsement") provides that the exclusions in paragraphs B.1.b, B.1.c, B.1.d, B.1.f, B.1.g, B.1.h., and B.2.g apply to the endorsement but that "[n]o other exclusions in Paragraph B. Exclusions apply to this Additional Coverage." (Id., ex. 1 at CCC40) Similarly, the endorsement entitled "ORDINANCE OR LAW" ("the Ordinance or Law Endorsement") explicitly states that "Paragraph B.1.a does not apply to this Additional Coverage."[7] (Id., ex. 1 at CCC45) In contrast, the Forgery and Alteration Endorsement is silent regarding the effect of any of the Paragraph B exclusions. This silence does not unambiguously indicate whether the

---

[7]Like the Forgery and Alteration Endorsement, the Fine Arts and Ordinance or Law Endorsements both add coverage "under Paragraph A.5. Additional Coverage." (D.I. 24, ex. 1 at CCC40, CCC45)

14

Forgery and Alteration Endorsement is subject to the False Pretense Exclusion or vice versa.

Where the language of an insurance policy is ambiguous, as it is in the context of the Forgery and Alteration Endorsement and the False Pretense Exclusion being read in tandem, the contract should be interpreted in favor of the insured because the insurer is in control of the process of articulating the terms. *See Oglesby*, 695 A.2d at 1149-50; *Axis Reinsurance*, 993 A.2d at 1062. Defendant was in a better position to foresee that plaintiff might fall victim to scams such as the one at hand[8] and could have used more explicit language to clearly and unequivocally express its intent. As such, it should not be able to evade responsibility because of the ambiguity.

The Third Circuit, applying "general principles of insurance law as developed by courts throughout the nation," has held that, where the language of an insurance policy is ambiguous and the effect of an endorsement unclear, the endorsement "must be given effect over the . . . body of the policy to the extent that the body is in conflict with the endorsement."[9] *Buntin v. Cont'l Ins. Co.*, 593 F.2d 1201, 1204 n.3, 1205-07) This

---

[8]Defendant has apparently processed claims similar to plaintiff's in the past. Tim Hendel, a property claim manager for defendant, wrote in an email in August 2010 that "[w]e've had many of these type [sic] of claims before with Atty's offices that receive checks, take out their fees and pays [sic] someone else, only later to find out that the check was 'fraudulent,' 'fictitious' or otherwise." (D.I. 23, ex. B) Such schemes were also known about prior to 2010. (*See* D.I. 21, exs. G, H & I) For example, *The Journal of the Delaware State Bar Association* published an article in November 2008, titled "Are You Really Too Smart to be Scammed?: Internet Scams and Attorney Trust Accounts," which described known instances of the type of scam perpetrated on plaintiff. (*Id.*, ex. G)

[9]It is unclear whether Delaware has explicitly adopted this principle for revolving conflicts between an endorsement and the body of a main policy. Regardless, the rule that ambiguity should be resolved in favor of the insured is sufficient to render plaintiff's

15

principle is especially true when it is more favorable to coverage. Accordingly, the rules for construing ambiguous policy language favor coverage of plaintiff's loss.

## V. CONCLUSION

For the foregoing reasons, the court denies defendant's motion for summary judgment and grants plaintiff's motion for summary judgment. An appropriate order shall issue.

---

loss covered.

16